**HUMANA MEDICAL PLAN, INC., Plaintiff,**

v.

**Elio VALDEZ, as Personal Representative of the Estate of Ernesto Valdez, deceased, Defendant.**

**No. 95–1577–CIV.–T–25C.**

United States District Court, M.D. Florida, Tampa Division.

March 31, 1997.

Order on Motion for Clarification, March 6, 1998.

**1348**

Clark Wade Yeakle, II, Yeakle & Watson, P.A., St. Petersburg, for Humana Medical Plan, Inc., plaintiffs.

Robert L. Vessel, Moffitt & Vessel, Tampa, FL, for Elio Valdez.

### ORDER

ADAMS, District Judge.

**THIS CAUSE** is before the Court upon Defendant's Motion to Dismiss (Dkt.3), Defendant's Motion for Summary Judgment (Dkt.9), Defendant's Supplement thereto (Dkt.12), and Plaintiff's Motion for Summary Judgment (Dkt.15), and, having considered same and the Parties' memoranda on the issues raised thereby, the Court makes the following findings of fact and conclusions of law:

## I. INTRODUCTION

### a. Undisputed Background Facts

Plaintiff is a health management organization ("HMO") federally licensed to provide replacement Medicare. Beginning in 1987 until his death, Decedent, Ernesto Valdez, was a member of Plaintiff's Medicare HMO by Plaintiff's acquisition of another health plan in June of 1987. Between April 19, 1994 and July 1, 1994, Plaintiff paid Decedent's medical and related benefits of $100,125.31, stemming from alleged medical malpractice and negligent care provided by Decedent's nursing home facility. Decedent's estate sued the nursing home in state court and settled its wrongful death claim for $170,-000.00 on or about June 21, 1995. Defendant asserts that it agreed on that settlement amount because, at the time, the nursing home's sole liability insurer was handling two other claims on the same policy (in effect from July 23, 1993 through July 23, 1994)

that were more egregious and, therefore, could have consumed the entire $1,000,000.00 in coverage.[1]

Prior to settlement and pursuant to Section 768.76, Florida Statutes, Defendant, via its counsel, gave notice to Plaintiff of Plaintiff's potential lien on December 6, 1994. On December 30, 1994, Plaintiff responded to Defendant's notice letter, stating:

> In accordance with the requirements of Florida Statutes 768.76, you are hereby notified that the above health plan is a collateral source payor on behalf of the above patient and hereby asserts its rights of subrogation and/or reimbursement.

*See* Composite Exhibit "4," attached to Defendant's Motion for Summary Judgment. Also on December 30, 1994 Plaintiff sent Defendant's counsel another letter, stating:

> The contract between the Health Plan and your client provides that the Health Plan has subrogation and/or recovery rights as an insurer. In this connection, the Health Plan also has the right to be reimbursed by your client for its costs of providing medical care in the event that any compensation is received by your client.

*Id.* Thus, prior to settlement with the nursing home in June of 1995, Defendant and its counsel were aware that Plaintiff had paid certain medical benefits for Decedent, as reflected by a Consolidated Statement of Benefits, dated March 13, 1995, and that Plaintiff intended to seek subrogation and/or reimbursement.

Plaintiff brings this declaratory action, claiming a federal right of subrogation lien pursuant to 42 C.F.R. Sections 417.528 and 411.37. Defendant argues that Plaintiff is estopped from pursuing a lien under federal law because of its actions and representations, and that Florida equitable subrogation law is not pre-empted by federal Medicare insurance lien law. By agreement, Defendant and Plaintiff have placed a joint check into an account pending the outcome of this case.

---

1. There is some speculation that the nursing home's liability insurer, in fact, had coverage of $2,000,000.00 to settle Defendant's claim. How-ever, whether the nursing home's coverage was one or two million dollars is of no consequence to the issues before the Court.

### b. Summary Judgment Standards

The grant of Summary Judgment is only proper if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56. The moving party satisfies its burden by showing an absence of evidence to support an essential element of the nonmoving party's case. *Id.* Once a party properly makes a motion for summary judgment by demonstrating to the district court the absence of a genuine material fact, whether or not accompanied by affidavits or other proof, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e); *Hoffman v. Allied Corp.,* 912 F.2d 1379, 1382 (11th Cir.1990)).

The standard for summary judgment mirrors the standard for a directed verdict. *Hoffman,* 912 F.2d at 1383. Thus, a dispute about a material fact is genuine, and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The Court must examine the evidence in light of the relevant substantive law when identifying which facts are material. *Id.*

The Court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Hoffman,* 912 F.2d at 1383. If the Court finds, under the relevant standards, that reasonable jurors could find a verdict for the nonmoving party since a disputed factual issue exists, summary judgment should be denied. *Id.* The Court may not decide a factual dispute. *Fernandez v. Bankers National Life Ins. Co.,* 906 F.2d at 559, 564 (11th Cir.1990). If a factual issue is present, the Court must deny summary judgment and proceed to trial. *Id.*

## II. LAW AND DISCUSSION

### a. Section 768.76

■ Plaintiff alleges federal question jurisdiction in this declaratory action on the ground that federal laws governing Medicare insurance entitle it to more favorable terms than those set out in Section 768.76, Florida Statutes, the state law governing insurance collateral sources and subrogation rights. Contending that federal pre-emption is not present, Defendant argues that neither 42 U.S.C. 1395mm (e)(4), nor C.F.R. Section 417.528, conflict with Section 768.76.

However, a review of Section 768.76 shows that a federal pre-emption analysis is unnecessary because Florida law expressly defers to federal Medicare laws that pertain to collateral sources. Section 768.76 defines "collateral sources" as payments made pursuant to the United States Social Security Act, "except Title XVIII and Title XIX." Further, Section 768.76 expressly states in relevant part:

> Notwithstanding any other provision of this section benefits received under Medicare, or any other federal program providing for a Federal Government lien on or right of reimbursement from the plaintiff's recovery... shall not be considered a collateral source.

*Id.,* at Subsection (2)(b). In other words, Medicare payments are not collateral sources under Florida's Section 768.76 and, therefore, Defendant cannot rely on the Section in determining Plaintiff's Medicare lien rights. *Id.; see also Cronin v. Washington National Insurance Co.,* 980 F.2d 663, 672 (11th Cir. 1993)("The statute specifically exempts Medicaid [and Medicare] payments from consideration as collateral sources...").

### b. Waiver and Estoppel

■ Having determined that Plaintiff's ability to recoup Medicare benefits paid to Decedent is exclusively governed by federal law, Defendant's affirmative defenses of waiver and estoppel must be examined. Defendant argues that Plaintiff waived its right to pursue recoupment under federal law because Plaintiff sought subrogation under Florida law, Section 768.76, and Defen-

dant reasonably relied on Plaintiff's representations regarding same. Specifically, on December 30, 1994, Plaintiff responded to Defendant's letter notifying Plaintiff of a possible settlement in the wrongful death case, by sending two (2) letters. The first December 30, 1994 letter states:

Collateral Source Provider Response... In accordance with the requirements of Florida Statutes 768.76, you are hereby notified that the above health plan is a collateral source payor on behalf of the above patient and hereby asserts its rights of subrogation and/or reimbursement.

The second December 30, 1994 letter states:

The contract between the Health Plan and your client provides that the Health Plan has subrogation rights as an insurer. In this connection, the Health Plan also has the right to be reimbursed by your client for its costs of providing medical care in the event that any compensation is received by your client.

This second letter from Plaintiff does not mention any state or federal statutory or regulatory law, but clearly asserts its rights under the policy to be subrogated and/or reimbursed for medical expenditures.

According to Defendant, it relied on Plaintiff's representation that Section 768.76 was applicable in determining to settle the underlying claim. Citing *Doe v. Allstate Ins. Co.*, 653 So.2d 371 (Fla.1995) and *Blue Cross/Blue Shield United of Wisconsin v. Inverrary Hotel Corp.*, 579 So.2d 863 (Fla. 4th DCA 1991), Defendant argues that Plaintiff should be estopped from now urging a different rule of subrogation.[2]

Regarding the doctrine of promissory estoppel, "broadly stated... is that promise which the promisor should reasonably expect to induce action or forbearance of a substantial character on the part of the promisee and which does produce such action or forbearance is binding if an injustice can be avoided only by an enforcement of the promise." *See* 22 Fla. Jur 2nd Estoppel and Waiver, Section 4. On the other hand, the doctrine of waiver requires the knowing, intentional relinquish-

ment of a known right, privilege, advantage, or benefit. *Id.*, at Section 89.

As indicated above, pursuant to Section 768.76, Defendant notified Plaintiff of the potential settlement and reimbursement. In turn, on December 30, 1994, Plaintiff sent Defendant's counsel two (2) letters that gave notice of Plaintiff's intent to enforce its reimbursement rights. Although one letter refers to Section 768.76, the other letter simply referenced Plaintiff's rights under the subject policy and did not mention any statute or regulation. No evidence has been presented that Plaintiff represented it would seek subrogation via Florida law only, and neither Defendant nor his counsel dispute that they were aware federally mandated Medicare coverage was involved in that potential lien. Thus, it was not reasonable for Defendant to assume Section 768.76 was Plaintiff's only vehicle for subrogation. Moreover, Defendant could and should have known that Medicare was expressly excluded from state law concerning equitable subrogation of collateral sources, as explained above.

Further, the evidence at bar is unequivocal that any detrimental reliance by Defendant that Section 768.76 would govern reimbursement was upon the insurer and attorney of the nursing home and/or Defendant's counsel, and not Plaintiff. Counsel for Defendant testifies via Affidavit that on June 21, 1995, a settlement conference was held with an adjuster of the nursing home's insurer. Attorneys for two other claimants against the nursing home were also present. Counsel for Defendant states:

5. During the settlement conference, the Senior Adjuster from Scottsdale Insurance Co. [insurer for the nursing home] made it clear that the value of the three claims was far in excess of his Company's Million Dollar Policy, and that he intended to enter into settlement, that day, which would exhaust his policy limits. He also indicated that the value of any two of the claims taken together exceeded a million dollars and that if any claimant refused to settle for the amount offered, he was simply

---

2. In his Affidavit, counsel for Defendant states that he counseled his client that Plaintiff's lien could be equitably adjusted downward, under Florida law, and that his client relied on the possibility of equitable subrogation in deciding to settle the wrongful death matter for $170,000.00.

going to pay his entire policy limits to the two claimants who would agree to settle.

6. Unfortunately, **the only way to resolve the aggregate coverage dispute was an action** for declaratory judgment [sic], leaving my client in the position of **choosing between rejecting a settlement** and depending upon a declaratory judgment to find additional coverage plus trying the nursing home case **or taking the settlement offered.**

7. **After lengthy negotiations, we arrived at a figure of $170,000.00 dollars for the claim of Mr. Valdez.**

8. Elio Valdez, who was the plaintiff in his father's case, was very upset over what he felt was to be a grossly inadequate settlement for his father's death and **at first refused to accept the sum offered.**

9. It was only after **I explained to Mr. Valdez** that we could go before a Judge and seek equitable subrogation of Humana's Lien and after **the Scottsdale Adjuster agreed to cooperate with us** in placing facts of the settlement before a Judge to determine the amount of that lien, that M. Valdez agreed to settle the case.

10. At no time prior to the settlement of the Valdez Case did plaintiff Humana ever indicate that it was seeking subrogation upon any other grounds than Section 768.76 FL Statute.[3]

*See* Affidavit of Defendant's Counsel (emphasis added). As further explained by Yvonne Renshaw, Defendant's nursing consultant, Defendant relied on the representations of its counsel, not Plaintiff:

> 5. I was present during the settlement negotiations of Mr. Valdezs' [sic] case, **and the key factor which convinced Mr. Valdez to settle his claim was Mr. Vessel's representation that he would seek to have Humana's lien substantially reduced through equitable subrogation.**

Affidavit of Yvonne Renshaw, at Paragraph 5 (emphasis added). Defendant's counsel's June 22, 1995 correspondence to Plaintiff is further evidence that Defendant's reliance, if any, was not upon Plaintiff:

> **Florida does allow for "equitable" subrogation,** where the Plaintiff has not collected the full value of his claim... **We will therefore be asking you** for a considerable discount beyond our right to have you pay your pro-rata share of fees and costs. **The attorney who was defending the nursing home in this case has also agreed** that, in the event that we are unable to reach a resolution, he is willing to testify to the matters which I have discussed above at a hearing, if necessary.

*Id.,* (emphasis added). Nowhere in the above-letter does Defendant remind Plaintiff that it has already "promised" to be solely governed by Florida law, nor that Defendant relied on such a promise in deciding to settle the claim. Rather the letter assumes that Florida law governs subrogation for Medicare payments and indicates that the attorney for the nursing home has agreed to assist in achieving equitable subrogation. Thus, representations by Defendant's counsel and/or the insurer and attorney for the nursing home, not Plaintiff, resulted in Defendant's settlement of the wrongful death case for $170,000.00.

Likewise, the Court finds no waiver by Plaintiff to seek reimbursement under federal law. On the contrary, via the two (2) December 30th letters, Plaintiff noticed its intent to engage its subrogation rights under the Medicare policy, which it has done.

#### c. *Application of Federal Law*

■ As Plaintiff's HMO contract with Decedent involved Medicare payments, Plaintiff's subrogation rights are governed by Section 1395mm (e)(4) because it provides that an "eligible organization" may seek reimbursement from a member when that person receives benefits from a third party liability insurance policy or plan for medical services initially covered by the organization. *Id.* The insurer of the nursing home, which paid the settlement amount to Defendant, is the third-party liability insurer.

Accordingly, Plaintiff is entitled to seek reimbursement from Defendant via 42 C.F.R.

---

3. As discussed above, however, Plaintiff never promised to seek subrogation solely under Section 768.76, rather Plaintiff merely complied with Florida's notice requirements as well as sending Defendant additional notice.

417.528(b)(2), which provides that an HMO may charge "(2) the Medicare enrollee, to the extent that he or she has been compensated under the law or policy," the amount of "covered Medicare services." To become eligible for reimbursement, an HMO must identify the primary payers, determine the amounts payable to those payers, and coordinate benefits of its Medicare enrollees with the payers. *Id.*

### III. CONCLUSION

Therefore, based upon the foregoing authority and reasons, it is

**ORDERED AND ADJUDGED:**

1.) Defendant's Motion to Dismiss (Dkt.3) is **DENIED**. Although Plaintiff may have intervened in the underlying state court action, *Blue Cross Blue Shield of Florida v. Matthews*, 498 So.2d 421 (Fla.1986), it was not so required.

2.) Defendant's Motion for Summary Judgment is **DENIED**.

3.) Plaintiff's Motion for Summary Judgment is **GRANTED**.

4.) **DECLARATORY JUDGMENT** in favor of Plaintiff and against Defendant is entered, as follows:

   a. Florida's collateral sources law expressly exempts Medicare from consideration;

   b. Plaintiff is entitled to be reimbursed for Medicare payments by Defendant, as provided in Section 417.528(b)(2).

### ORDER ON MOTION FOR CLARIFICATION

**THIS CAUSE** is before the Court upon Defendant's Motion for Clarification (Doc. 34) of this Court's March 31, 1997 Order (Doc. 33) and, having considered said motion, and the record herein, the Court finds:

Defendant moves to clarify the March 31st Order because its is "in doubt" as to the meaning of the language contained in the Order: "(2) the Medicare enrollee, to the extent that he or she has been compensated under the law or policy." The language quoted is from 42 U.S.C. § 1395mm (e)(4)(B), instead of 42 C.F.R. § 417.528(b)(2) as cited in the Order. The regulation provides that the HMO may charge "the Medicare enroll-

ee, to the extent that he or she has been paid by the carrier, employer, or other entity." 42 C.F.R. § 417.528(b)(2). Both the statute, § 1395mm and the regulation, § 417.528 are clear, and authorize Plaintiff to recover any amount paid by it for covered Medicare services, to the extend paid to Defendant by the liability carrier. Obviously, if there is a dispute as to the amount paid to Defendant by the liability carrier for covered Medicare services, a hearing will be necessary.

Neither the statute or regulation cited authorize a percentage reduction for fees and costs for an HMO charging a Medicare enrollee who is paid by a liability carrier for services provided by the HMO. Therefore, it is

**ORDERED:**

That to the extent stated herein, the Motion for Clarification is **GRANTED**, otherwise said motion is **denied**.